IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FINANCIAL & SECURITY PRODUCTS ASSOCIATION, a not-for-profit corporation,<br><br>    Plaintiff,<br><br>  v.<br><br>DIEBOLD, INCORPORATED, an Ohio corporation, erroneously sued as DIEBOLD, INC.,<br><br>    Defendant.<br>_____ / | No. C 04-04347 WHA<br><br>**ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION** |

### INTRODUCTION

In this antitrust action, plaintiff seeks a preliminary injunction. Because this order finds that plaintiff has failed to demonstrate a likelihood of success on the merits, irreparable injury, that the balance of hardships tips sharply in its favor or that relief is necessary for advancement of the public interest, the preliminary-injunction motion is **DENIED**.

### STATEMENT

Plaintiff Financial & Security Products Association ("FSPA") is a non-profit organization bringing this lawsuit on behalf of its members. Its members include, among other entities, several third-party maintenance companies ("TPMs") that service automated teller machines ("ATMs") manufactured by others. Defendant Diebold, Incorporated is one such manufacturer of ATMs. In addition to new ATMs, Diebold also sells refurbished ATMs, spare parts and repair services.

The complaint, filed on October 14, 2004, alleges (1) monopolization in violation of § 2 of the Sherman Act, (2) attempted monopolization in violation of § 2 of the Sherman Act and (3) unfair competition in violation of California Business & Professions Code §§ 17200 *et seq.* FSPA seeks injunctive relief and disgorgement of profits; the complaint does not seek damages. This action arises out of alleged changes in Diebold's policies with respect to certain parts, diagnostic software and technical manuals. Specifically, the complaint alleges that Diebold previously had an "open-door policy" on servicing by TPMs, allowing virtually unlimited access to spare parts and diagnostic software (Compl. ¶ 13). Now, Diebold has allegedly closed that door, at least with respect to a special upgrade now underway.

In 2003, Visa and MasterCard announced that all ATM owners would soon be required to upgrade their machines to conform with a new mandatory encryption standard known as the Triple Data Encryption Standard ("3DES"), which would allow for more secure transactions. All 3DES upgrades must be completed by December 31, 2005; most ATM owners are currently in the process of upgrading (Mercina Decl. ¶¶ 4–5, Exh. A).

To meet this new security standard, Diebold developed its EPP4 keypad. Although initially Diebold permitted TPMs to purchase EPP4 keypads, it changed its policy in 2004, so only Diebold personnel could install this part. Its website indicated that this policy was necessary both because (1) it was required by Visa and MasterCard to track the locations of its EPP4 keypads and (2) it wished to protect its proprietary technology and prevent third parties from unlocking patented software features that were not licensed by the ATM owner (Hahm Exh. B). In March 2005, however, in response to customer complaints, Diebold changed its policies to allow TPMs to purchase EPP4 keypads, provided that they enter into a licensing agreement (Ducey Decl. ¶ 24, Exhs. G & H). FSPA contends that the agreement terms are onerous to TPMs (see Hahm Exh. K). In response, Diebold points out that 3DES-compliant alternatives are available from at least two sources, ATM Exchange and PI Systems (Mercina Exhs. B & C). It argues that these alternatives are adequate substitutes, such that a TPM can still provide upgrades for owners of Diebold ATMs, even if the TPM declines to enter into a licensing agreement to obtain EPP4 keypads.

In addition, FSPA alleges that while Diebold's diagnostics software was previously protected with the password "000000," certain tools in a software application called TCS+ are now protected with real passwords. Diagnostics software is used by technicians to pinpoint the source of error in a malfunctioning ATM. Diebold asserts that basic diagnostic tools are still available and that only advanced software features it was developing for its new Opteva line of ATMs are password-protected (Mercina Decl. ¶¶ 12–19). Diebold also points out that the TCS+ password would be provided at no charge to any TPM that enters into a license agreement for the diagnostics software (see Hahm Exh. L; Lucas Decl. ¶ 7).

Finally, FSPA argues that Diebold has also recently changed its policies with regard to its technical documentation for ATMs. Now, manuals are only provided if the TPM enters into yet another licensing agreement (see Hahm Exh. M). FSPA argues that the terms of this license are so unfavorable to TPMs that it would eliminate all profits from servicing Diebold ATMs (McLaughlin Reply Decl. ¶ 10; Mulder Reply Decl. ¶ 11; Womack Reply Decl. ¶ 10). Diebold counters that manuals are not *required* to service ATMs; rather, they merely make a technician's job easier. In fact, when Diebold technicians service ATMs made by other manufacturers, they often do so without the benefit of such manuals (Bucci Decl. ¶¶ 16–17).

FSPA now moves for a preliminary injunction which would enjoin Diebold from all of the aforementioned conduct and require it to revert to its pre-2004 "open-door" policies. Diebold argues that its new policies were enacted to protect its intellectual property rights in its next-generation Opteva ATMs. In particular, Diebold points to copyright protection and six patents (all issued in 2003 or later) that apparently cover the diagnostic software and operational software employed by its Opteva ATMs as well as the method of encryption made possible by its EPP4 keypad (Ducey Exhs. A–F). FSPA has not challenged the validity of Diebold's intellectual property rights.

**ANALYSIS**

1. **LEGAL STANDARD.**

To obtain a preliminary injunction, the traditional equitable factors considered are: (1) whether there is a strong likelihood of success on the merits, (2) the possibility of

irreparable injury to plaintiff if the preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) (in some cases) the public interest.  Alternatively stated, the moving party must demonstrate *either* (1) a likelihood of success on the merits and the possibility of irreparable injury, or (2) the existence of serious questions going to the merits and the balance of hardships tips sharply in its favor.  *Johnson v. Cal. State Bd. of Accountancy*, 72 F.3d 1427, 1430 (9th Cir. 1995).  These are not two separate tests.  Rather, "[t]his analysis creates a continuum:  the less certain the district court is of the likelihood of success on the merits, the more plaintiffs must convince the district court that the public interest and balance of hardships tip in their favor."  *Southwest Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 917–18 (9th Cir. 2003).  Under either formulation of this standard, however, a significant threat of irreparable harm must be shown.  *Big County Foods, Inc. v. Bd. of Educ. of the Anchorage Sch. Dist.*, 868 F.2d 1085, 1088 (9th Cir. 1989).

As described below, this order finds that FSPA has failed to meet its burden.  Accordingly, preliminary injunctive relief is inappropriate.

**2.     LIKELIHOOD OF SUCCESS ON THE MERITS.**

**a. Standing.**

At the outset, this order questions whether FSPA has standing to seek an injunction on behalf of its members.  Standing in antitrust cases "requires an inquiry beyond that performed to determine standing in a constitutional sense."[1]  *Bubar v. Ampco Foods, Inc.*, 752 F.2d 445, 448 (9th Cir. 1985).  Private actions to enforce antitrust laws are authorized by Sections 4 and 16 of the Clayton Act.  Because the complaint does not seek damages, this order focuses on the latter, which allows private actions for injunctive relief "against threatened loss or damage by a violation of the antitrust laws."  15 U.S.C. 26.  To have standing under § 16, a plaintiff must

---

[1] The Supreme Court has identified certain factors which must be evaluated on a case-by-case basis to determine whether a proper party is bringing the private antitrust lawsuit: (1) the nature of the plaintiff's alleged injury; (2) the directness of the injury; (3) whether the harm is speculative; (4) the risk of duplicative recovery; and (5) the complexity in apportioning damages.  *Eagle v. Star-Kist Foods, Inc.*, 812 F.2d 538, 540 (9th Cir. 1987)(*citing Associated Gen. Contractors of Calif., Inc. v. Calif. State Council of Carpenters*, 459 U.S. 519, 538–45 (1983)).  Because a private lawsuit under § 16 "raises no threat of multiple lawsuits or duplicative recoveries," unlike a § 4 case, some of these factors would not be relevant to determining standing in such actions.  *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 111 n.6 (1986).

demonstrate (1) a threatened loss or injury cognizable in equity (2) proximately resulting from the alleged antitrust violation. *Rohnert Park v. Harris*, 601 F.2d 1040, 1044 (9th Cir. 1979). An antitrust plaintiff must allege "*antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)(noting that antitrust laws are intended to protect *competition*, not *competitors*)(emphasis in original). Regardless of whether the action proceeds under § 4 or § 16, the Supreme Court has reinforced that "the plaintiff must still allege an injury of the type the antitrust laws were designed to prevent." *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 111 (1986).

Here, FSPA does not allege that it has suffered or will suffer from any antitrust injury *itself*. Rather, it asserts that it will indirectly be harmed as *its members* are negatively affected by Diebold's policy changes (see Vrabec Decl. ¶ 5; Murray Exh. F at 29:8–16). In other areas of the law, the Supreme Court has said that an association has Article III standing to bring suit on behalf of its members if: (1) its members would otherwise have standing to sue on their own; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members. *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977). But, no appellate authority has ever extended this rule to override the *Brunswick/Cargill* requirements under the federal antitrust laws.

*Southwest Suburban Board of Realtors v. Beverly Area Planning Association*, 830 F.2d 1374 (7th Cir. 1987) is the closest case of any such extension.[2] The *Southwest Surburban* decision, however, ultimately found that the plaintiff lacked standing because the *Hunt* factors were not met. *Id.* at 1380–81. Significantly, the Seventh Circuit stated it was "skeptical whether [the association] could meet the third part of the *Hunt* test in light of the *Cargill* decision requiring § 16 plaintiffs to demonstrate the threat of antitrust injury." *Id.* at 1381. So

---

[2] An earlier Eighth Circuit decision did hold that an association "otherwise appropriate to present the issues involved should not be precluded from bringing § 16 actions." *Associated Gen. Contractors of N. Dakota v. Otter Tail Power Co.*, 611 F.2d 684, 690 (8th Cir. 1979). Yet, this decision was written before *Cargill* and did not refer to *Brunswick* at all.

5

1  too here.  In the absence of clear Ninth Circuit or Supreme Court authority extending *Hunt* to
2  antitrust cases, this Court is reluctant to ignore the *Brunswick/Cargill* requirement that a
3  plaintiff must prove it has or will suffer antitrust injury itself.  This alone is dispositive.[3]

### b. Monopolization and Attempted Monopolization.

Even assuming the FSPA has standing, it is also far from certain that plaintiff will succeed on the merits, at least on the record currently before the Court.  Section 2 of the Sherman Act, if read literally, broadly provides that monopolization or attempted monopolization is illegal.  15 U.S.C. 2.  Yet, merely possessing a "monopoly in the popular sense" is not enough to violate § 2, unless the monopolist "has acquired or maintained his strategic position, or sought to expand his monopoly, or expanded it by means of those restraints of trade which are cognizable under § 1."  *United States v. Griffith*, 334 U.S. 100, 106 (1948).

To prove monopolization, a plaintiff must prove that the defendant has monopoly power (*i.e.*, the power to control prices or to exclude competition) in the relevant market; that such power was willfully acquired or maintained; and that plaintiff sustained antitrust injury.  Proving attempted monopolization requires a plaintiff to show a specific intent to control prices or to destroy competition; predatory or anticompetitive conduct directed to accomplishing that end; a dangerous probability of success, and antitrust injury.  Conduct that is found not to be willful acquisition or maintenance for a charge of monopolization cannot be predatory in a charge of attempted monopolization either.  *Supermarket of Homes, Inc. v. San Fernando Valley Bd. of Realtors*, 786 F.2d 1400, 1404–05 (9th Cir. 1986).

With respect to whether Diebold possesses monopoly power, the parties disagree as to how the relevant market should be defined.  Because of differences between ATMs made by

---

[3] Even if representational standing is appropriate in § 16 cases, it is unclear whether the interests of only some members (*i.e.*, TPMs) are germane to FSPA's overriding purposes, when many of its members are not even involved in the ATM industry.  Moreover, while the fact that FSPA only seeks injunctive relief (rather than damages) "substantially lessens the need for individual member participation," establishing antitrust injury involves complex questions of fact that will likely require proof from individual members, unlike the questions of law presented in the typical agency review cases in which representational standing is now well established.  *Compare Southwest Suburban Bd. of Realtors v. Beverly Area Planning Ass'n*, 830 F.2d 1374, 1381 (7th Cir. 1987).

6

1  different manufacturers, spare parts for Diebold machines are not interchangeable with parts for
2  other ATMs. Thus, plaintiff argues that the relevant market is spare parts and services for
3  Diebold ATMs.[4] Defendant counters that ATM owners are sophisticated customers that engage
4  in life-cycle pricing (*i.e.*, calculating the total cost of purchasing equipment and servicing it
5  during its lifetime), such that alternative brands and refurbished machines are also considered at
6  the time of purchase. If so, then the relevant product market is ATMs, of which Diebold is only
7  one brand. This order defers ruling on which proffered market definition is correct, because
8  plaintiff has not sufficiently demonstrated that it is likely to succeed in proving the other
9  elements of a § 2 violation.

10  A primary obstacle that plaintiff will need to overcome in succeeding on the merits is
11  the fact that Diebold's ATM and associated software appear to be protected by several
12  recently-issued patents. A patent, is by its very nature, a *lawful* monopoly, at least for the
13  duration of the patent term.[5] FSPA does not challenge the validity of defendant's patents, nor
14  does it allege any fraudulent procurement or misuse of patent rights, which would be actionable
15  as antitrust violations. *See Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382
16  U.S. 172 (1965). In addition, Diebold's manuals and software are also protected by copyright
17  law.

18  In attempting to harmonize the "obvious tension" between intellectual property and
19  antitrust laws, both of which serve the public interest, the Ninth Circuit has adopted the
20  following rebuttable presumption: while the unilateral refusal to license a patent or copyright
21  could constitute exclusionary conduct, "a monopolist's 'desire to exclude others from its
22  [protected] work is a presumptively valid business justification for any immediate harm to

---

[4] Plaintiff further argues that the sale of *new* Diebold parts, especially EPP4 keypads, is a market in which Diebold (naturally) has 100% market share. This definition of the relevant market is rejected because there are numerous sources for *used* Diebold parts, which are essentially equivalent for purposes of refurbishing or servicing ATMs.

[5] The word "monopoly" is used cautiously. While a patent confers an exclusive right to make, use or sell the patented items, such an exclusive right does not automatically translate in to a "monopoly" under the antitrust laws. That is a more complicated question. A monopoly for antitrust purposes presupposes a cognizable product market. For example, if the relevant product market were "computers," a patent on "computer chips" would not be a relevant monopoly.

7

consumers.'" *Image Tech. Servs. v. Eastman Kodak Co.*, 125 F.3d 1195, 1218 (9th Cir. 1997) (internal citation omitted). Here, FSPA has not successfully rebutted Diebold's explanation that its policies were enacted to protect its intellectual property rights (as well as reduce the risk of identity theft).

As for the alleged antitrust injury, this order notes that the anticompetitive effects, if any, of Diebold's new policies are not likely to be felt throughout the entire aftermarket of servicing and maintaining Diebold ATMs. FSPA's allegation boils down to a claim of decreased competition for the specific service of upgrading Diebold ATMs with EPP4 keypads, a one-time event for any particular machine, which is set to be completed by December 31, 2005. The Court doubts whether a relevant market could be defined as narrowly as this. The record does not demonstrate that TPMs are in danger of losing contracts for ATM servicing or maintenance more generally, even for servicing or maintaining Diebold ATMs. Put differently, Diebold's new policies will not eliminate competition except, if at all, as to installing a single component and only between now and the end of the year.

Moreover, even as to 3DES upgrades, plaintiff's case for injury to competition is not powerful, although it is plausible. Plaintiff's best argument is that Diebold will sell the EPP4 part and installation know-how to TPMs only at list prices, which would be cost-prohibitive. Therefore, no TPM will be able to compete with Diebold in the upgrade to EPP4 keypads, or so it is argued. But the argument is based on the assumption that TPMs cannot raise their prices to end users to cover the additional costs. This is a fast glide over thin ice. The record does not convincingly prove up this assumption. TPMs already price their services as much as 10-20% below Diebold. They may be able to pass on the incremental expenses and still make a profit, for all the record shows. Only experience under the Diebold regime will tell the tale. Right now, all we have is speculation of doom. This is not enough to warrant the drastic remedy of a mandatory preliminary injunction to regulate Diebold's policies and price structures.

### c. Unfair Competition.

As the same conduct is alleged to be both an antitrust violation and unlawful or unfair business acts in violation of California Business & Professions Code §§ 17200 *et seq.*, the Court

8

1  need not conduct a separate analysis.  "To permit a separate inquiry into essentially the same
2  question under the unfair competition law would only invite conflict and uncertainty and could
3  lead to the enjoining of procompetitive conduct."  *Chavez v. Whirlpool Corp.*, 113 Cal. Rptr.2d
4  175, 184 (Cal. App. 2d Dist. 2001).  Regardless, this order notes that FSPA is more likely to
5  demonstrate that it has standing to represent its members with regard to a § 17200 claim than
6  under the more rigorous test for antitrust.

7        **3.**      **IRREPARABLE INJURY.**

8      Not only has FSPA failed to demonstrate a likelihood of success on the merits, but it has
9  also failed to prove that irreparable injury will result if a preliminary injunction is not granted.
10 Irreparable harm must not be speculative or merely alleged to be imminent; in other words, "a
11 plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary
12 injunctive relief."  *Caribbean Marine Servs. Co. v. Baldridge*, 844 F.2d 668, 674 (9th Cir.
13 1988)(emphasis in original).  While the threat of being driven out of business would be
14 sufficient to establish irreparable harm, mere loss of revenue is not; such injury would be
15 compensable in damages.  *Am. Passage Media Corp. v. Cass Commuunications, Inc.*, 750 F.2d
16 1470, 1473–74 (9th Cir. 1985).

17     Again, this order stresses that FSPA has not attempted to prove that it will suffer any
18 irreparable injury *itself*.  Instead, FSPA proffers declarations regarding four of its members,
19 TPMs that were allegedly negatively affected by Diebold's policies:  (1) Atlanta Computer
20 Group; (2) Genpass Service Solutions; (3) Shields Business Solutions; and (4) FiSource (see
21 Adlerman Decl., Mulder Decl., Shields Decl., and Womack Decl., respectively).  Yet, close
22 examination of their statements reveals that FSPA essentially argues that these TPMs are only
23 at risk of being driven out of the business *of servicing Diebold ATMs*, not being driven out of
24 business altogether.

25     Indeed, while some TPMs indicated they have lost contracts to service Diebold
26 machines, others could not identify any particular deals lost as a result of Diebold's policies,
27 much less that they were at risk of being driven out of business (Murray Exh. A at 146:6–19;
28 Exh. D at 100:15–21).  All four indicated that they, like most TPMs, refurbished or serviced

1  ATMs made by other manufacturers as well.  One TPM, (Advent), even characterized itself as a
2  "growing business" (Murray Exh. B at 48:1–2).  Even for the two TPMs that did lose some
3  customers, it was admittedly a small percentage of their overall business (Murray Exh. C at
4  93:7–125:6 [lost contracts on approximately 25 out of 1000 ATMs serviced]; Exh. E at
5  206:11–207:12 [lost contracts on fewer than 100 out of 6500–7000 ATMs serviced]).  No TPM
6  has indicated that its business depended exclusively on servicing only ATMs made by Diebold.

   As such, the injuries suffered by TPMs appear wholly financial in nature.  FSPA has
failed to meet its burden of demonstrating that any of its members are at risk of going out of
business or otherwise suffering irreparable harm.  (Although some TPMs made conclusory
allegations of irreparable harm to good will and reputation, FSPA has proffered no evidence in
support of these claims.)

   Diebold's new policies may render it more difficult for TPMs to install EPP4 keypads, if
their customers so desire; at least, that is the allegation.  There is some evidence to support this,
but at this point, an injunction would be premature and anticipatory.  Again, the actual effects of
Diebold's policy changes are still unknown.  FSPA assumes that TPMs cannot raise the prices
they charge to end-users to cover their costs.  It assumes that the 3DES-compliant alternatives
are not viable in the marketplace.  These assumptions may eventually prove correct, but this
record is not convincing enough.  At this point, it would be rash to enter a mandatory injunction
to regulate the terms and conditions of Diebold's policies.  If it turns out that plaintiff's
predictions are correct, then its member TPMs (or ATM owners) could bring their own lawsuits
to recover damages to the extent that they are able to prove an antitrust injury.

   **4.   BALANCE OF HARDSHIPS AND PUBLIC INTEREST.**

   The foregoing is sufficient.  Although it is unnecessary to assess the remaining criteria
for a preliminary injunction, this order notes that plaintiff fails to demonstrate that the balance
of hardships tips strongly in its favor.  The balance of the hardships tips, if at all, in defendant's
favor.  If this injunction were granted, Diebold would essentially be forced to give up its
intellectual property rights.  Under plaintiff's proposed return to an "open door" policy, it would

1 have to grant royalty-free licenses to any TPM that requested access to its proprietary materials.
2 Allowing defendant to enforce its patents and copyrights also serves the public interest.

### CONCLUSION

For the reasons stated above, plaintiff's motion for a preliminary injunction is **DENIED**. If plaintiff ultimately prevails after a trial on the merits, the question of injunctive relief would be revisited at that time. As it was not necessary to rely upon any evidence to which objections were raised, this order declines to rule on those objections.

**IT IS SO ORDERED.**

Dated:  July 8, 2005



WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE